UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

LESSIE TILLMAN,

        Plaintiff,

vs.

C. R. BARD, INC., a New Jersey corporation, and BARD PERIPHERAL VASCULAR, INC., an Arizona corporation,

        Defendants.
_____/

Case No.  3:13-cv-00222-MMH-JBT

JURY TRIAL DEMANDED

**DEFENDANTS C. R. BARD, INC. AND BARD PERIPHERAL VASCULAR, INC.'S MOTION TO EXCLUDE THE OPINIONS OF MICHAEL FREEMAN, PH.D. AND MEMORANDUM OF LAW IN SUPPORT**

Pursuant to Federal Rules of Evidence 702 and 403, as well as *Daubert v. Merrell Dow Pharmaceutical, Inc.*, 43 F.3d 1311 (9th Cir. 1993) and its progeny, Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively, "Bard") respectfully move to exclude expert opinions offered by Michael Freeman, Ph.D. ("Dr. Freeman"), an epidemiologist retained by the plaintiff. For the reasons articulated herein, Dr. Freeman's opinions should be excluded. This motion is supported by the following Memorandum of Law and exhibits. Pursuant to Local Rule 3.01(j), Bard requests oral argument on the motion, and requests 30 minutes of hearing time.

**MEMORANDUM OF LAW**

**I.  INTRODUCTION**

The plaintiff has named Dr. Freeman to offer an opinion that the Bard G2® Filter (the "Filter") was failing at an "alarmingly high" rate relative to other permanent and retrievable filters. (*See* Freeman Report, March 8, 2014, p. 1, 5 of 24, attached hereto as Ex. A). In his

36111933.1

1

Report, Dr. Freeman also opined that Bard had access to information that provided a "strong indication" that the Filter was failing at an increased rate, implying that Bard failed to take appropriate action. (*See id.* at 1-2, 5-6 of 24). During his deposition in this matter, Dr. Freeman confirmed that he intended to proffer the latter opinion at trial of this case. (April 29, 2014 Deposition of Michael Freeman, Ph.D., pp. 67:19-68:1, attached hereto as Ex. B).

Neither of the opinions offered by Dr. Freeman is admissible in this case. First, Dr. Freeman admits that that data he utilized to support his opinions, the United States Food and Drug Administration's ("FDA"), Manufacturer and User Facility Device Experience database (known as "MAUDE") cannot be used to calculate comparative rates for adverse events or complications. (Ex. B, 94:8-13). Since he agrees the data he used does not allow for calculation of precise comparative rates between products, and since Dr. Freeman has no training or experience in the field of implantable devices, his opinion that Bard filters were failing at an "alarmingly high" rate compared to other manufacturers' devices is unreliable and should not be admitted. Second, Dr. Freeman's opinion regarding Bard's corporate conduct should be excluded because Dr. Freeman is not qualified to opine as to Bard's corporate conduct, particularly as it relates to inferior vena cava ("IVC") filters, as he freely admits he has no expertise in either IVC filters or corporate responsibility of a medical device company. Moreover, Dr. Freeman's opinion in this regard is unhelpful to the trier of fact, as it essentially is a summary of the contents of certain internal Bard documents capable of being understood by laymen.

For these reasons, Dr. Freeman's opinions are unreliable and inadmissible. In addition, the probative value of Dr. Freeman's opinions is substantially outweighed by a danger of unfair prejudice and confusing the issues for, or misleading, the jury. Accordingly, Bard moves to exclude Dr. Freeman under Federal Rules of Evidence 702 and 403, and the standards set forth in

*Daubert v. Merrell Dow Pharmaceutical, Inc.*, 43 F.3d 1311 (9th Cir. 1993) and its progeny.

## II.    FACTUAL BACKGROUND

### A.  The Plaintiff And Her Claims

The plaintiff, Lissie Tillman, brings this product liability action alleging injuries as a result of the implant of the Filter. The Filter is a prescription medical device that was manufactured and sold by Bard, and is intended to be placed in the large vein leading from the lower extremities to the heart and is designed to trap blood clots before they can reach the heart or lungs, thereby preventing life-threatening events. The plaintiff advances several theories of alleged product defect, alleging that the Filter tilted and perforated her IVC.

### B.  Dr. Freeman's Background, Role, and Opinions

#### 1.  Dr. Freeman's Background and Role

Dr. Freeman is an epidemiologist who received his Master's of Public Health in 1995 and his Ph.D. in public health in 1997. (Ex. B, 23:15-24). Since that time, he has held several academic positions, including his current position as Affiliate Professor of Epidemiology and Psychiatry at the Oregon Health and Science University in Portland, Oregon, which he has held since 2010.

Dr. Freeman does not have a license to practice medicine and is not providing testimony as a medical doctor. (*Id.* at 7:24-8:5, 9:18-22, 10:24-11:14). Dr. Freeman has no employment or educational background in medical devices, has performed no research on medical devices, and has published no articles or other works regarding medical devices. (*Id.* at 41:21-25). Dr. Freeman has not witnessed an IVC filter being placed or removed, and has only ever seen one IVC filter in the human body, which was during an autopsy unrelated to IVC filters. (*Id.* at 41:11-20).

Dr. Freeman characterizes his role in this litigation as "very much from the perspective of an epidemiologist rather than an expert in forensic medicine." (*Id.* at 126:19-22). However, as discussed below, Dr. Freeman quickly forgets this role and attempts to offer opinions regarding standards of corporate conduct in a field in which he has no experience. These opinions do not fall within Dr. Freeman's areas of expertise and are prejudicial to Bard inasmuch as they unreliable and may serve to improperly influence the trier of fact.

2. Dr. Freeman's Opinions

Dr. Freeman's Report contains two opinions. First, Dr. Freeman attempts to quantify, and then to qualify, the Filter's adverse event rates compared to other permanent and retrievable IVC filters, stating:

> A review of the available data indicates that the G2 IVC filter was failing at a significantly increased rate relative to Bard's predicate permanent device, the [Simon Nitinol Filter ("SNF")], as well as in comparison with both permanent and retrievable filters from other manufacturers. In particular, the rate of migration and perforation is significantly higher than for all other devices; relative to the non-Bard retrievable filters, and non-Bard permanent filters, the G2 filter migrates 6.3 and 11.0 times more often, respectively. The device is associated with perforation of the inferior vena cava 2.9 and 5.0 times more often than the competitors' retrievable and permanent filters, respectively. In comparison with the device the replaced [sic] the G2, the G2X, the G2 was associated with 8.4 times more migrations and 3.6 times more failures of any kind.
>
> Further, a review of quarterly failure data indicates that there were early indicators prior to 2008 (by 2005, in fact, within 6 months of the introduction of the G2 in the market) that the device was failing and causing adverse events at a rate that was substantially elevated relative to other IVC filters on the market, including the predicate SNF filter.
>
> * * *
>
> There were early signals within the first 2 quarters of sales of the Bard G2 filter in 2005 that indicate that it was failing at an alarmingly high rate for PE, fracture, migration and perforation relative to Bard's SNF permanent IVC filter, as well as in comparison with other manufacturers' permanent and retrievable filters. . . . Of critical importance, within 2 quarters the G2 matched or exceeded the rate of perforation and migration observed in the withdrawn Recovery filter.

* * *

> Overall, the cumulative rate of all failures/adverse events for the G2 was 3.8 times greater than non-Bard permanent filters, and 4.7 times greater than for non-Bard retrievable filters. The G2 suffered from fractures 13.3 times more often than permanent non-Bard filters and 9.1 times more often than retrievable non-Bard filters.

(Ex. A, pp. 1-2, 5 of 24).

Second, Dr. Freeman also opines in his report that, given the information he analyzed, Bard was on notice that the Filter may have been defective, implying that Bard did not take appropriate action:

> As mentioned earlier in this report, all of the data that I have used for the previously described analyses were in Bard's possession. The quarterly safety signal analysis was not particularly complicated and would have provided Bard with a strong indication that the G2 IVC filters were failing and causing adverse events at a relatively high rate within a matter of months and their release on the market. The cumulative annual analysis was also straightforward, and undeniable evidence that the trends observed in the quarterly analysis were, in fact, a harbinger of persisting high failure rates for the G2 filter.

(*Id*. at 5 of 22).

### III.   LEGAL STANDARD

Under Fed. R. Evid. 702, a qualified expert may testify to "help the trier of fact to understand the evidence or to determine a fact in issue" only if the proffered testimony is "based on sufficient facts or data" and "is the product of reliable principles and methods" and if "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The "trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Ebereli v. Cirrus Design Corp.*, 615 F.Supp.2d 1357 (S.D. Fla. 2009). Instead, the trial court's role is to ensure that "speculative, unreliable expert testimony does not reach the jury." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010).

Federal courts also have the authority to exclude evidence if its probative value is substantially outweighed by a danger of, among other things, unfair prejudice and confusing the issues for, or misleading, the jury. Fed. R. Evid. 403.

## IV. ARGUMENT AND CITATION OF AUTHORITY

Dr. Freeman's opinions are not admissible in evidence under Federal Rules of Evidence 702 and 403, as well as under *Daubert v. Merrell Dow Pharmaceutical, Inc.* and its progeny. Dr. Freeman's opinion regarding the "alarmingly high" comparative rate of adverse events for the Filter versus competitors' filters is based on insufficient and wholly unreliable data, the use of which has been widely criticized as unsound scientific methodology. Moreover, Dr. Freeman is not qualified to render his opinion regarding Bard's corporate conduct and, in any event, that opinion would not assist the trier of fact. Rather, this opinion is highly prejudicial and would confuse the issues in this case for the jury. Accordingly, both of Dr. Freeman's opinions should be excluded in this case.

### A. Dr. Freeman's Opinions Should be Excluded Because They are Not Based on Sufficient Data and are Not the Product of Reliable Methods

Dr. Freeman's opinion that the Filter was failing at an "alarmingly high" rate relative to other permanent and retrievable filters is based on analysis of adverse event reporting data from FDA's public MAUDE database. The MAUDE database contains reports of adverse events involving medical devices, although it is limited to "voluntary reports since June 1993, user facility reports since 1991, distributor reports since 1993, and manufacturer reports since August 1996." (Manufacturer and User Facility Device Experience Database, *available at* http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/PostmarketRequirements/ReportingAdverseEvents/ucm127891.htm (last visited June 25, 2014)).

It is well established, however, that adverse event reporting data from MAUDE are

unreliable and wholly unfit for use to calculate comparative rates of adverse events, as Dr. Freeman purports to do.[1] While this information provides some useful data as to numbers of adverse events that have been reported, the MAUDE database does not accurately estimate the actual number of adverse events for a particular device, because what constitutes a reportable adverse event in the database is the subject of federal regulations (21 C.F.R. § 803.1, *et seq.*), which can be interpreted differently by different doctors, hospitals, and device companies. As such, different reporters may or may not report otherwise identical events. In fact, the FDA has stated that voluntary adverse event reporting systems, like MAUDE, are subject to a variety of reporting biases and that data may be affected by the submission of incomplete or duplicate reports, underreporting, or reporting stimulated by publicity or litigation, leading to "substantial limitations in interpretation because of the inherent uncertainties in the numerator and denominator." (*See* FDA, *Guidance for Industry: Good Pharmacovigilance Practices & Pharmacoepidemiologic Assessment,* 2005 WL 3628217 § IV(G) (Mar. 2005), *available at* http://www.fda.gov/downloads/RegulatoryInformation/Guidances/UCM126834.pdf-title= Guidance (last visited June 25, 2014)). As a result of these uncertainties, FDA provides a disclaimer that "[t]he number of reports cannot be interpreted or used in isolation to reach conclusions about the existence, severity, or frequency of problems associated with devices." (MAUDE Database search page, *available at* http://www.accessdata.fda.gov/ scripts/cdrh/cfdocs/cfmaude/search.cfm (last visited June 25, 2014)). FDA also specifically warns that the MAUDE data "cannot be used to establish rates of events, evaluate a change in

---

[1] Although Bard has evaluated MAUDE data in the past, the company has recognized that reliable comparisons could not be made with that data. Today, Bard utilizes a comprehensive process for estimating the complication rates of its own devices (without attempting comparisons to competitive devices). That process relies on multiple sources beyond the MAUDE database, including customer complaints, medical literature, physician input, and sales representatives' observations.

36111933.1                                                 7

event rates over time or compare event rates between devices." (*Id*.).

In his deposition, Dr. Freeman openly acknowledged these disclaimers and the inherent limitations of adverse event reporting data. He testified that he is familiar with the FDA's disclaimers regarding the MAUDE database and has "been aware of the limitations and benefits of these reporting databases for quite a long time." (Ex. B, 43:8-15). Dr. Freeman also testified that he is aware that FDA reporting encourages duplicative reporting of adverse events and requires reporting of adverse events without regard to causation or user error (*Id.* at 100:16-101:18, 102:12-20), and acknowledged that MAUDE data was the weakest form of scientific data. (*Id.* at 90:3-17). Indeed, when presented with another expert's statement that "MAUDE data is not to be used to evaluate rates for adverse events," Dr. Freeman answered "I don't disagree." (*Id.* at 94:8-13).

Despite understanding the inherent limitations of adverse event data,[2] as well as the

---

[2] Dr. Freeman's comparative rate analysis is further flawed because he used similarly unreliable data to estimate the total number of each filter type sold, which is the denominator of his supposed comparative rates of failure. To determine the denominator, Dr. Freeman solely utilized data from IMS, an industry group that collects and sells such data. (Ex. B, 62:24-63:5, 66:23-67:10). Dr. Freeman had never worked with IMS data before this litigation and, although he has never talked with anybody at IMS to determine how they collect or maintain their data, he testified that it was his "impression" upon that IMS has "a monopoly on being able to collect and charge for and provide data" and that "[t]here seems to be some lack of transparency with how they collect and give out their data." (*Id.* at 44:13-45:5, 121:2-15). Dr. David Feigal, Bard's expert, has testified that this lack of transparency makes IMS sales data unreliable for use in calculating adverse event rates. (May 21, 2014 Deposition of David Feigal, M.D. M.P.H., p. 131:6-25, attached hereto as Ex. C). Indeed, federal district courts have recognized that IMS data is inaccurate. *See, e.g., Caple v. Daiichi Sankyo United States Pharma, Inc*., 2011 U.S. Dist. LEXIS 146521, 3-4 (E.D. Pa. Dec. 20, 2011) ("IMS employs a projection data gathering methodology that does not account for each and every prescription written for a particular drug. This method results in a certain acknowledged degree of imprecision in IMS's data.") (internal citations and quotations omitted); *Blue Cross & Blue Shield v. AstraZeneca Pharms. LP (In re Pharm. Indus. Average Wholesale Price Litig.)*, 582 F.3d 156, 189 (1st Cir. Mass. 2009) (holding that AstraZeneca unfairly and deceptively published Zoladex prices, and in doing so, upheld district court finding that the prices given to IMS "did not provide a clear representation of the spreads on Zoladex").

FDA's disclaimers regarding its use, Dr. Freeman purports to have derived the rate of adverse events for the Filter and concluded that it is "alarmingly" higher than rates seen in other devices. Dr. Freeman cannot utilize such unreliable data to draw his conclusions that "rates" are "alarmingly high." *See McClain v. Metabolife Intern. Inc.*, 401 F.3d 1233, 1250 (11th Cir. 2005) (noting that an expert relying upon adverse event data as an "important source" of data "relied upon data that lacks the indicia of scientific reliability."); *In re Accutane Products Liability*, 511 F.Supp.2d 1288, 1298-1303 (M.D. Fla. 2007) (noting that adverse event reports offer "one of the least reliable sources" of scientific information, which are "are unreliable as proof of causation."). Moreover, because he is not a medical doctor, has no experience with implantable devices or the relative complications reported for such medical devices, and has done no survey of doctors utilizing these products, Dr. Freeman does not have the background or expertise to determine whether the differences in rates between the Filter and other devices is "alarming."

Under *Daubert*, federal district courts are obligated to examine "the methodology by which the expert reaches his conclusions" to determine if they are "sufficiently reliable." *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). When witnesses rely on adverse event reporting data, as Dr. Freeman attempts to do here, federal courts, including the Middle District of Florida, routinely reject the use of such data as unsound, unreliable scientific methodology.[3] State courts

---

Despite Dr. Freeman's ignorance as to how IMS data is collected and/or maintained, and the fact that there was a lack of transparency in both of those processes, he admittedly made no attempt to determine the accuracy of the data he used to calculate his comparative rates or to clean that data in any way before making his calculations. (Ex. B 68:2-14). As such, not only is the data upon which Dr. Freeman relies to determine the number of adverse events inherently unreliable (the numerator), but so is the data upon which he relies for the total number of filters in the marketplace (the denominator), resulting in a wholly unreliable calculation.

[3] *See, e.g.*, *In re Accutane*, 511 F.Supp.2d at 1298 (M.D. Fla.); *see also McClain*, 401 F.3d at 1250 (11th Cir.); *Cloud v. Pfizer, Inc.*, 198 F. Supp. 2d 1118 (D. Ariz. Nov. 21, 2001) (excluding expert opinion based upon AERs and "retrospective case reports" because such items "are

applying similar scientific validity standards join with federal courts in excluding expert testimony based on adverse event reports as scientifically unreliable.[4]

Since the FDA and courts considering the MAUDE data have both concluded that the data cannot be used in isolation to reach a conclusion about either the frequency or severity of reported events, Dr. Freeman's reliance on that data for his opinions that the Filter's comparative adverse event rate is "alarmingly high" compared to other devices lacks reliability. In addition,

---

merely compilations of occurrences, and have been rejected as reliable scientific evidence supporting an expert opinion."); *see also In re Baycol Products Litigation*, 532 F. Supp.2d 1029 (D. Minn. July 16, 2007) (excluding expert opinion on comparative drug risk based upon AERs, stating that "the limitations inherent in AER data" preclude any rate of error analysis and "no evidence has been submitted to demonstrate that such an analysis is generally accepted."); *Glastetter v. Novartis Pharmaceuticals Corp.*, 252 F.3d 986 (8th Cir. June 8, 2001) (affirming exclusion of expert opinion based upon adverse event reporting, as mere "case reports" suffer from numerous flaws and are "not scientifically valid proof of causation."); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation*, 2001 WL 454586 (E.D. Pa. Feb. 1, 2001) (stating that adverse event reports "are universally recognized as insufficient and unreliable evidence of causation."); *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387 (D. Or. Dec. 18, 1996) (excluding expert opinion and noting that "case reports and case studies are universally regarded as an insufficient scientific basis for a conclusion regarding causation because case reports lack controls."); and *Casey v. Ohio Medical Products*, 877 F. Supp. 1380 (N.D. Cal. Feb. 28, 1995) (excluding expert report based upon a study that was based upon foreign adverse event reports because adverse event reports "simply describe reported phenomena without comparison to the rate at which the phenomena occur," "do not isolate and exclude potentially alternative causes," and "do not investigate or explain the mechanism of causation.").

[4] *See, e.g., Swallow v. Emergency Medicine of Idaho, P.A.*, 67 P.3d 68 (Idaho April 2, 2003) (excluding expert opinion based upon adverse event reports because "there is no showing that [the AERs are] a greater incidence of such events than would be expected to occur by chance."); see also *Heckstall v. Pincus*, 797 N.Y.S.2d 445 (N.Y.A.D. June 16, 2005) (excluding expert opinion based upon adverse event reports, noting that they are "unverified listings and reporting of adverse reactions . . . [and] "are not generally accepted in the scientific community on questions of causation."); *Creazzo v. Medtronic, Inc.*, 903 A.2d 24 (Pa. Super. 2006) (affirming exclusion of expert opinion based upon MDRs, reasoning that they "invite rank speculation and are not demonstrably relevant to the failure of the individual unit" and an inference of defect cannot be drawn from the number of complaints.); *Ranes v. Adams Laboratories, Inc.*, 778 N.W.2d 677 (Iowa Feb. 5, 2010) (affirming exclusion of expert opinion based upon AERs and published case reports because "case reports are merely accounts of medical events. They reflect only reported data, not scientific methodology." "[T]he methodology used by the expert becomes suspect when it is only supported by case reports of limited use to the medical field.").

he is without the qualifications or experience to categorize the differences in the data such that he can conclude any differences are "alarming." To permit Dr. Freeman to opine as such would necessarily prejudice Bard. Accordingly, Dr. Freeman's opinions are inadmissible under Rule 702 and Rule 403 and should be excluded.

Moreover, Dr. Freeman opines that the Filter also experienced elevated rates of fracture and migration compared to other filters, opinions which should be excluded because they are wholly irrelevant to this matter and prejudicial to Bard. Federal Rule of Evidence 702 permits expert testimony only when it "will help the trier of fact to . . . determine a fact in issue." Here, Dr. Freeman's Report focuses on what he contends are the Filter's comparatively high migration and fracture rates:

> In particular, the rate of migration . . . is significantly higher than for all other devices; relative to the non-Bard retrievable filters, and non-Bard permanent filters, the G2 filter migrates 6.3 and 11.0 times more often, respectively. . . . In comparison with the device that replaced the G2, the G2X, the G2 was associated with 8.4 times more migrations.
>
> * * *
>
> There were early signals within the first 2 quarters of sales of the Bard G2 filter that indicate that it was failing at an alarmingly high rate for PE, fracture, migration and perforation relative to Bard's SNF permanent IVC filter, as well as in comparison with other manufacturers' permanent and retrievable filters. The G2 suffered from fractures 13.3 times more often that permanent non-Bard filters and 9.1 times more often than retrievable non-Bard filters.

(Ex. A, pp. 1-2, 5 of 24).

However, here, even the plaintiff's medical expert admitted that the Filter has neither fractured nor migrated. (*See* May 20, 2014 Deposition of Jeffrey Hull, M.D., pp. 78:23-79:1, 111:10-15, attached hereto as Ex. D). Therefore, Dr. Freeman's opinions regarding these failure modes would not assist the trier of fact to determine any issue in this case, as required by Rule 702, and should be excluded. *See Van Der Valk v. Shell Oil Co.*, 2004 WL 5486643, *2-3 (C.D.

Cal. Nov. 15, 2004) (excluding a portion of an expert's report under Fed. R. Evid. 702 and 403 that "in no way relates" to the matter before the court); *Apple, Inc. v. Samsung Electronics Co., Ltd.*, 2012 WL 2571332, *4 (N.D. Cal. June 30, 2012) (excluding expert testimony as irrelevant when it addressed issues no longer before the court). Moreover, these opinions are prejudicial to Bard and would confuse the issues for the jury, but have no probative value in the instant case. Fed. R. Evid. 403; *Van Der Valk*, 2004 WL 5486643 at *2-3. As such, Dr. Freeman's opinions regarding the Filter's comparative fracture and migration rates are inadmissible under Rule 702 and Rule 403 and should be excluded.

### B. Dr. Freeman's Opinion Regarding Bard's Corporate Conduct Should be Excluded Because He Lacks Sufficient Training and Experience Regarding Both Corporate Conduct and IVC Filters and His Opinions Would Not Assist the Trier of Fact

To the extent Dr. Freeman intends to opine regarding Bard's corporate conduct with regard to the Filter, such an opinion should be excluded because Dr. Freeman is not qualified to provide it. Dr. Freeman frankly admits that he is not an expert in corporate responsibility and corporate conduct. He testified that "I think it goes beyond my expertise to know . . . you know, whatever that level of sort of corporate responsibility, I think that's completely outside of my wheelhouse." (*Id.* at 99:19-100:3). Moreover, Dr. Freeman admits that he has no background in IVC filters. He has no educational background in IVC filters, has performed no research on IVC filters, and has published no articles or other works regarding IVC filters. (*Id.* at 41:21-25). In fact, before he was retained in this case, Dr. Freeman had not provided expert testimony regarding IVC filters. (*Id.* at 15:16-16:4). Because Dr. Freeman has no expertise in either corporate responsibility or IVC filters, he should not be permitted to opine as to Bard's corporate responsibility with regard to the Filter.

In his Report, Dr. Freeman states that the data available to Bard before the Filter was

implanted in the plaintiff would have provided an "early," "strong indication that [the Filter was] failing and causing adverse events at a relatively high rate within a matter of months of [its] release on the market" and that Bard had data in its possession that was "a harbinger of persisting high failure rates" for the Filter, implying that Bard should have taken action based on the data it possessed. (Ex. A, pp. 2, 5 of 24). In his deposition, Dr. Freeman expanded this "expert opinion," testifying that, based on his so-called comparative failure rates and Bard internal documents he reviewed and summarized, "Bard could have found out that the *information that they're gathering tells them that they have a disaster on their hands* . . . I'm trying to tell you what Bard could have done with the information that they had . . . *I would be very surprised if that was a corporate policy of ignore safety signals* [sic]." (Ex. B, p. 94:15-95:13) (emphasis added). He further stated that his expert report "wasn't trying to provide a state of the art analysis of what was actually going on. What I wanted to provide was what the data that Bard had at the time demonstrated." (*Id.* at 115:23-116:2). The strong implication from Dr. Freeman's Report, about which he is likely to testify, is that Bard knew the Filter's adverse event rate, but chose not to take action.[5]

The resulting narrative is a closing argument, not an expert opinion, which should be excluded because it is a thinly-veiled attempt to interject irrelevant and anecdotal accounts of Bard's alleged "bad acts" in order to confuse the issues in this case, unfairly influence the jury, and prejudice Bard. *See* Fed. R. Evid. 403; *see also In re: Fosamax*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (excluding "bad company" testimony with marginal relevance to the issues in controversy). Even if Dr. Freeman's opinion on Bard's corporate conduct presented relevant

---

[5] Notably, Dr. Freeman testified that he has no idea what actions Bard took after receiving the MAUDE data that forms the basis of his opinions. (Ex. B, p. 153:9-11).

facts, it is precisely the kind of "opinion" that federal district courts exclude as lay matters.[6] For instance, in *In re: Trasylol Products Liability Litigation*, 709 F. Supp. 2d 1323, 1346 (S.D. Fla. 2010), the court excluded testimony concerning regulatory history, FDA correspondence, and internal company documents, noting that the issues should be presented to the jury directly, not through an expert who "regurgitates them and reaches conclusory opinions . . . and invades the province of the jury." Because Dr. Freeman's opinion on corporate conduct—which he is not qualified to make—would not assist the trier of fact, but merely summarizes documents within the comprehension of a layperson, it should be excluded in this case. *Id.*; *Frazier*, 387 F.3d at 1262-63 (also noting that an expert opinion is not helpful to the trier of fact "when it offers nothing more than what lawyers for the parties can argue in closing arguments"). For these reasons, Dr. Freeman's opinion as to Bard's corporate responsibility with regard to the Filter should be excluded in this case.

## V.     CONCLUSION

As discussed above, Dr. Freeman's opinions are inadmissible under Federal Rules of Evidence 702 and 403, as well as under *Daubert* and its progeny. Accordingly, they should be excluded in their entirety.

DATED this 1st day of August, 2014

---

[6] *See, e.g., In re: Baycol Prods. Litig.*, 495 F. Supp. 2d 977, 1014-15 (D. Minn. 2007), *amended at* 532 F. Supp. 2d 1029 (D. Minn. 2007) (excluding testimony as "lay matters" and "conclusory statements about questions of fact masquerading behind a veneer of technical language" where plaintiffs proffered an expert to opine that Bayer ignored its toxicologists' concerns about Baycol's steep dose-response curve as it concerned Baycol's safety profile); *In re: Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 555 (S.D.N.Y. 2004) (excluding expert testimony concerning the alleged downplaying of hepatotoxic effects of Rezulin in the published literature based on internal documents, memos, and e-mails, finding that the issues constituted "lay matters").

NELSON MULLINS RILEY & SCARBOROUGH LLP

s/Taylor Tapley Daly
Richard B. North
(Admitted *Pro Hac Vice*)
Taylor Tapley Daly
(Admitted *Pro Hac Vice*)
Matthew B. Lerner
Fla. Bar No. 548618
Atlantic Station
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322 6000
(404) 322 6050 (fax)
richard.north@nelsonmullins.com
taylor.daly@nelsonmullins.com
matthew.lerner@nelsonmullins.com

CARLTON FIELDS, P.A.

David E. Cannella
Fla. Bar No. 983837
CNL Center at City Commons
450 S. Orange Avenue, Suite 500
Orlando, Florida 32801-3336
Telephone: (407) 244-8235
Facsimile: (407) 648-9099
dcannella@calrtonfields.com

*Attorneys for C. R. Bard, Inc. and Bard Peripheral Vascular, Inc.*

## LOCAL RULE 3.01(g) CERTIFICATE OF CONFERRAL

Pursuant to M.D. Fla. Loc. R. 3.01(g), Defense counsel certifies that they conferred with Plaintiff's counsel on July 30, but Plaintiff's' counsel refuses to consent to the relief requested in this Motion.

## **CERTIFICATE OF SERVICE**

I CERTIFY that on the 1st day of August, 2014, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

    *s/David E. Cannella*
    Attorney